A. Barry Cappello (CSB No. 037835)
abc@cappellonoel.com
G. Michael Brelje (CSB No. 269476)
mbrelje@cappellonoel.com
Richard Lloyd (CSB No. 332101)
rlloyd@cappellonoel.com
David Edholm (CSB No. 362232)
dedholm@cappellonoel.com
**CAPPELLO & NOËL LLP**
831 State Street
Santa Barbara, CA 93101-3227
Telephone:   (805) 564-2444
Facsimile:    (805) 965-5950

*Attorneys for Petitioner/Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| THE SANTA BARBARA APARTMENT ASSOCIATION, INC., d/b/a SANTA BARBARA RENTAL PROPERTY ASSOCIATION, a California nonprofit mutual benefit corporation; TERESA PATIÑO, an individual; JKRK, L.P., a California limited partnership; 3442 RICHLAND, LLC, a California limited liability company; and 1501 SB, LLC, a California limited liability company,<br><br>    Petitioner and Plaintiffs,<br><br>v.<br><br>CITY OF SANTA BARBARA, a municipal corporation; CITY COUNCIL OF THE CITY OF SANTA BARBARA; and DOES 1 through 20, inclusive.<br><br>    Respondents and Defendants. | **Case No.**  2:26-cv-03602<br><br>**COMPLAINT FOR PRELIMINARY INJUNCTION AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE**<br><br>**[42 U.S.C. § 1983; 28 U.S.C. § 2201; CAL. CODE CIV. PROC. § 1085]** |

Petitioner and Plaintiff THE SANTA BARBARA APARTMENT ASSOCIATION, INC., d/b/a SANTA BARBARA RENTAL PROPERTY ASSOCIATION ("SBRPA"), Ms. Teresa Patiño ("Ms. Patiño"), JKRK, L.P. ("JKRK"), 3442 Richland, LLC ("3442 Richland"), and 1501 SB, LLC ("1501 SB") (collectively, "Plaintiffs")[1] allege as follows:

### GENERAL ALLEGATIONS/NATURE OF THE CASE

1.      This action arises out of two rent control ordinances (collectively, the "Ordinances") introduced by Defendant City Council of the City of Santa Barbara ("City Council") on January 13, 2026, and sequentially adopted by Defendant City of Santa Barbara ("City of SB") on January 27, 2026.

2.      The first ordinance, entitled "Establishing a Temporary Rent Increase Moratorium During the Preparation, Consideration, and Potential Adoption of a Permanent Rent Stabilization Program" ("Rent Freeze Ordinance") retroactively prohibits *any* form of rent increase for the most economically burdened residential rental properties in the City of Santa Barbara. The Ordinance was adopted on January 27, 2026, and is slated to remain active through at least the 2026 Calendar Year.  The Rent Freeze Ordinance violates the Takings Clause of the 5th Amendment of the United States Constitution, as applied to the states by the 14th Amendment of the United States Constitution. A true and correct copy of the Rent Freeze Ordinance is attached hereto as **Exhibit A** and is incorporated herein by reference.

3.      The second ordinance, "Amending the Santa Barbara Municipal Code by the Addition of Section 26.50.100 Relating to Additional Requirements for Just Cause Evictions for the Purpose of Permanently Removing a Unit from the Rental Market," ("Just Cause Eviction Amendments") confronts Plaintiffs with a Hobson's Choice when managing their property — evict all tenants from the property, or

---

[1] SBRPA seeks relief by Writ of Mandate and is, therefore, a "Petitioner," but is referred herein as "Plaintiff" for simplicity. The same is true of Defendant-Respondent, referred to as "Defendant."

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

none. The Amendments also "lock-out" all withdrawn rental units from the rental market for *five years* from the date of last eviction. The Just Cause Eviction Amendments are preempted by the Ellis Act.  A true and correct copy of the Just Cause Eviction Amendments is attached hereto as **Exhibit B** and is incorporated herein by reference[2].

4.      In addition, Defendant City Council abused its discretion in introducing and adopting the Ordinances and failed to technically comply with its own Charter. Councilmembers Harmon, Santamaria, Sneddon, and Gutierrez — each of whom voted in favor of the Ordinances — recklessly hastened the legislative process. Despite the Council majority rejecting the proffered "emergency" findings, the Ordinances were hastily and unreasonably enacted because of a pretextual agenda not reasonably based on the facts presented to the Council. Such process was rife with personal and political bias that epitomized arbitrary and capricious reasoning. The Ordinances continue to have widespread impact on Plaintiffs, and based on numerous economic studies are likely to negatively impact both the availability and habitability of affordable rental housing supply in the City of Santa Barbara. Plaintiff SBRPA seeks and is entitled to a Writ of Mandate.

5.      Neither of the two ordinances provide a mechanism for affected property owners to apply for, or obtain, (1) a variance based on economic hardship or emergency circumstances, or (2) appeal any findings by the City of SB concerning economic hardship or emergency circumstances. The practical economic realities of affected rental property owners — whose pocketbooks are impacted by inflation, high property taxes, increasing insurance premiums, unpredictable international and domestic policies, and now legal costs — have *no* means of obtaining relief based on individual circumstances under the Ordinances.

---

[2] Plaintiffs are informed and believe that the draft ordinance presented was signed without changes.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

The omission of such procedure is a staggering violation of Plaintiffs' property and due process rights under the United States Constitution.

## JURISDICTION AND VENUE

6. The claims alleged in this action arise out of federal law, including the Fifth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. Accordingly, jurisdiction is appropriate under 28 U.S.C. §§ 1331 and 1343(a)(3). This Court has pendent jurisdiction over the California claim under 28 U.S.C. § 1367.

7. Venue is proper in the U.S. District Court for the Central District of California under 28 U.S.C. §§ 1391(b)(1) and (b)(2). Defendants conduct business and reside within the Central District of California and a substantial part of the events giving rise to the claims set forth herein occurred in this district.

## PARTIES

8. Plaintiff The Santa Barbara Apartment Association, Inc., d/b/a Santa Barbara Rental Property Association ("SBRPA") is a nonprofit organization under section 501(c)(6) of the Internal Revenue Code. More than one-thousand individuals and entities are dues-paying members who own, manage, and provide services to more than 23,000 rental housing units in Santa Barbara. SBRPA brings this challenge on behalf of itself and its affected owner-members.

9. Plaintiff Ms. Teresa Patiño is an individual rental property owner who resides in the State of California.

10. Plaintiff JKRK, L.P. ("JKRK") is a California limited partnership and rental property owner.

11. Plaintiff 3442 Richland, LLC ("3442 Richland") is a California limited liability company and rental property owner.

12. Plaintiff 1501 SB, LLC ("1501 SB") is a California limited liability company and rental property owner.

13. Defendant City of Santa Barbara ("City of SB") is a municipal

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

corporation located in Santa Barbara County in the State of California.

14.    Defendant City Council is the City's governing legislative body. The City Council is comprised of seven members: Randy Rowse, Wendy Santamaria, Mike Jordan, Oscar Gutierrez, Kristen Sneddon, Eric Friedman, and Meagan Harmon.

15.    Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 20 and therefore sue Defendants by such fictitious names. Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously named Defendants is in some manner responsible or liable for the events and happenings referred to herein, and that each such fictitiously named Defendant caused injury and damage to Plaintiffs as alleged in this Complaint/Petition. Plaintiffs will amend or seek leave of court to amend this Complaint/Petition to allege the true names and capacities of such fictitiously named Defendants when the same are ascertained.

16.    On information and belief, at all relevant times, Defendant City Council and all City Officials named or referenced by Title herein were the agent acting on behalf of Defendant City of SB, and all actions alleged herein were done within the ordinary scope and course of such agency or employment.

**FACTS**

17.    On October 14, 2025, councilmembers Santamaria and Sneddon moved to introduce a novel rent control ordinance without public notice, nor notice to their fellow councilmembers. Their actions sparked a cascade of community concern, and panic for some property owners, and established their agenda to adopt a rent control ordinance as quickly as possible.

18.    During the hearings that followed, public comments from concerned property owners that were directed to the City of SB and the City Council fell on deaf ears. At times, some of the councilmembers laughed, shook their heads, or rolled their eyes at the concerns of distressed commenters, demonstrating an

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

impenetrable bias. Reliable economic data was flippantly disregarded, and the adoption of the Ordinances relied on speculation, anecdotal evidence, and "gut feeling." On the admission of Mayor and Councilmember Rowse, City Council put the cart before the horse while they vowed to smooth out the "details" *ex post facto*. Owners, tenants, and even City Council, remain confused about the scope and application of the Rent Freeze Ordinance, the impacts of which are now felt by the entire city.

### *Defendant councilmembers Santamaria and Sneddon's October 2025 "surprise" rent control ordinance set the tone for an arbitrary and capricious process.*

19.     At the October 14, 2025 City Council meeting, councilmembers Santamaria and Sneddon proposed an "Ordinance adding Chapter 26.90 to Title 26 of the Santa Barbara Municipal Code related to Rent Stabilization." On information and belief, Santamaria and Sneddon drafted such Ordinance without transparency or collaboration with the public or other councilmembers. The Proposed Ordinance was introduced as a potential model for a permanent rent stabilization ordinance, yet its introduction sparked the "temporary" Rent Freeze Ordinance adopted on January 27, 2026. Sneddon stated "[i]n an effort to save staff time and [city] money, councilmember Santamaria and myself worked with pro bono attorneys to develop a starting point. . . to develop an ordinance . . . ."[3] On information and belief, they contracted with outside counsel and developed the Proposed Ordinance without City Council's approval, in violation of Section 518 of the Charter of the City of Santa Barbara, which requires City Council approval. The proposal caused rental property owners to scramble for clarity about the City's policy direction and incited calls for due diligence before adopting an ordinance. A true and correct copy of the Proposed Ordinance entitled "An Ordinance Adding Chapter 26.90 to Title 26 of

---

[3] City of Santa Barbara – City TV (@Citytv18), *City Council – October 14, 2025*, YOUTUBE (Oct. 14, 2025 @ 3:50:22), accessible at https://www.youtube.com/live/gka6ai5GhAc [hereinafter *Oct. 14th Meeting*].)

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

the Santa Barbara Municipal Code Related to Rent Stabilization" is attached hereto as **Exhibit C** and is incorporated herein by reference.

20. On October 14, 2025, a myriad of legitimate concerns about the long-term effects of rent control and the importance of due diligence were pushed aside and ignored. In response to comments about researching the downstream economic impacts, Santamaria stated "[f]rankly, we don't have the money for a consultant. And as much as we need public input, it's still not fiscally responsible for us to throw money at yet another consultant to come back and tell us what we already know, because we are already living it."[4] Yet approximately one month *after* the effective date of the Rent Freeze Ordinance, Defendant City Council voted 4–3 to approve a contract to hire a consulting firm to advise on a rent control ordinance.

21. The lack of transparency was obvious and received pushback from fellow councilmembers. For example, Harmon stated that "the submission of a fully developed ordinance. One that was written behind closed doors, created without public input, and without a single public conversation as to the policy specifics between and amongst the seven of us . . . putting forth a full ordinance and asking that it be agendized — whatever the real intent — seems almost destined to pit community members against one another in ways that were totally foreseeable. […] I'm just begging us to be a little more thoughtful, a little more inclusive, a little more focused in developing a rent stabilization policy moving forward."[5] Despite the secrecy of the drafting process, and lack of public input, Defendant City Council voted 4–3 to move the agenda forward.

22. Defendant City Council affirmatively voted "[t]hat Council consider the request from councilmembers Santamaria and Sneddon to consider an Ordinance Adding Chapter 26.90 to Title 26 of the Santa Barbara Municipal Code Related to Rent Stabilization and Development of a Work Plan to Fund and

---

[4] *Oct. 14th Meeting*, at 3:38:28.
[5] *Oct. 14th Meeting*, at 4:16:45.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

Administer a Rent Stabilization Program and determine whether to place the item on a future agenda for full discussion," despite widespread concern about a rushed and opaque process from within City Council, and the public at large. The Motion passed 4–3, however, Mayor and Councilmember Rowse, who with two fellow councilmembers voted "No," summarized the hasty process. "I'm not willing to go forward with this because . . . this cake got taken out of the oven way too quickly."[6] And in conversation with other councilmembers on the record, Santamaria proposed, "no more doing things behind closed doors, I think we can all agree on that, right?"[7]

***The City Administrator introduced the idea of a temporary rent control ordinance without a formal motion or "Emergency" declaration by City Council, instead citing calls for urgency from only select councilmembers.***

23.    On October 14, 2025, Sneddon, Santamaria, and Harmon strongly opined about their preference to accelerate a rent control ordinance. "Rent stabilization is coming. And it's coming sooner rather than later," said Harmon, "[I'm] hardly able to stomach any more [conversations about rent control]. […] I definitely don't like the idea of another year going by."[8] Santamaria decried "no more delays,"[9] and Sneddon said "I'm here for [rent control] in whatever format it needs to come in."[10] Sneddon later moved "to begin the work plan on rent stabilization and to come back *before the end of the year*."[11]

24.    On December 16, 2025, the Senior Assistant to the City Administrator, Barbara Andersen, introduced the idea of a rent freeze moratorium on the record, doing so without a declaration of an "Emergency" by City Council. On information

---

[6] *Oct. 14th Meeting*, at 4:29:26.
[7] *Oct. 14th Meeting*, at 4:32:35.
[8] *Oct. 14th Meeting*, at 4:22:15.
[9] *Oct. 14th Meeting*, at 4:32:35.
[10] *Oct. 14th Meeting*, at 4:11:52.
[11] *Oct. 14th Meeting*, at 4:46:24.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

and belief, such a suggestion was outside the scope of her authority. Ms. Andersen stated that her office would "be the A-team . . . as we shepherd this process through, [] *with the sense of urgency you've conveyed to all of us.*"[12]  At such time, no measure had been passed to consider a temporary rent control ordinance. Ms. Andersen, however, proposed the Rent Freeze Ordinance as a "temporary" measure to restrict rent increases given the time it will take to develop a permanent ordinance.[13]

### ***The public was deprived of a fair legislative process.***

25.    On December 16, 2025, virtually all comments about the potential detrimental economic impact of the Ordinances were brushed aside by councilmembers Gutierrez, Santamaria, Sneddon, and Harmon.

26.    Commenters, including SBRPA and several of its members, voiced concern about the detrimental economic impacts of rent control. Studies were presented to the Council from credible economic journals and newspapers, such as the *Wall Street Journal*, about the negative long-term impacts of rent control on a city's housing and rental markets. "Mom-and-Pop" owners raised concern about the concrete economic impact of the proposed ordinances on their expected return on investment. Commenters shared real-life examples of unexpected financial burdens, such as medical bills for treating a terminal illness or a $200,000 unforeseen construction project. Each of these events required the commenters to raise their tenants' rents, in many cases from an existing below-market rate.

27.    But the majority of Defendant City Council ignored and stonewalled such comments and declared that the time to debate the specifics of rent control policy is *after* the Rent Freeze Ordinance is adopted. "There are going to be plenty

---

[12] City of Santa Barbara – City TV (@Citytv18), *City Council – December 16, 2025,* YouTube (Dec. 16, 2025), accessible at https://www.youtube.com/live/UyOUAB3PZUE [hereinafter *Dec. 16th Meeting*]
[13] *Dec. 16th Meeting*, at 3:11:15.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

of future opportunities to consider and debate the specifics [of the policy],"[14] said Harmon. "[The Rent Freeze Ordinance] is gonna [*sic*] preserve the state of play as we move to develop [a permanent ordinance]. Giving all parties some . . . breathing room to step back and consider these issues thoroughly and thoughtfully."[15]Rather than debate the specifics of the policy, Santamaria simply stated "[I am] very much in favor of [a rent increase moratorium]. I'd hope that we could bring this back as soon as possible. I know our staff mentioned possibly even in January, which I think would be helpful."[16]

28.     At the end of the session on December 16, 2025, Friedman raised concern about the lack of candor and responsiveness to the commenters. "Some of the comments I heard. It feels like they're just completely ignored . . . and it felt like this is gonna [*sic*] get railroaded through. . . . [A]t this point, it feels like everything that was said about trying to find common ground, a lot of that was just discounted by some of the comments . . . ."[17] Santamaria, who voted in favor of the Ordinances, shook her head and rolled her eyes at the comment.

### ***The adoption of the Rent Freeze Ordinance and Just Cause Eviction Amendments was arbitrary and capricious.***

29.     The Rent Freeze Ordinance and Just Cause Eviction Amendments were formally introduced on January 13, 2026, and adopted two weeks later, on January 27, 2026. Such actions were arbitrary and capricious. On the record, these actions were based on anecdotal experience and "gut feelings," rather than supported by credible data.

30.     At the December 16, 2025 meeting, one topic of discussion was whether to "exclude" certain rental units from the Rent Freeze Ordinance. Harmon stated that she is generally not inclined to exclude certain properties. "[I]f there is a

---

[14] *Dec. 16th Meeting*, at 5:17:20.
[15] *Dec. 16th Meeting*, at 5:19:59.
[16] *Dec. 16th Meeting*, at 6:36:07.
[17] *Dec. 16th Meeting*, at 7:01:24.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

justification for that, I'm open to considering it. But I guess if we're asking for gut reactions, well, that's my gut reaction."[18] Sneddon said "because there is the ability to have rent increases by petition, by process, and I think that because there is that, would be, that ability, we don't have to have blanket exemptions."[19] Yet a manner to adjust rents is absent from the Rent Freeze Ordinance.

31.     The most significant glossed-over detail was a variance procedure for individualized rent adjustments to ensure each property owner is guaranteed a reasonable rate of return on their investment. During sessions on the introduction and adoption of the Ordinance, no council member moved to include a variance procedure, despite discussion about the importance of including one.  Even those who voted in favor of the Rent Freeze Ordinance spoke *in favor* of including a variance procedure. Santamaria, for example, was particularly adamant about including a robust appeals process. On December 16, 2025, she talked about the *need* for a strong and effective appeals process in at least five separate comments. ("[T]here is a way to keep owners protected with a balanced approach. That balanced approach is a robust appeals process.").[20] And Sneddon cited the variance procedure to support her decision against exemptions. Nevertheless, the Rent Freeze Ordinance was adopted absent any variance procedure or appeals process.

32.     Sneddon misapplied irrelevant, anecdotal evidence to support her economic analysis of the Ordinances. She cited her "lived experience" and increase in fair market value of a single unit of property from 1972 until 2024.[21] After showing attendees a line chart of her childhood apartment measuring "profitability," she opined "I know that property values go up, even if you're doing nothing. Even if you're not renting it out. So the rent that you're receiving is on top of the profit of that property doubling, tripling in value . . . so, [that profit] literally

---

[18] *Dec. 16th Meeting*, at 5:22:22.
[19] *Dec. 16th Meeting*, at 6:00:22.
[20] *Dec. 16th Meeting*, at 6:27:55.
[21] *Dec. 16th Meeting*, at 5:56:13.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

is on top of everything else."[22] While failing to account for debt accrual, costs for maintenance and upkeep, taxes, insurance, or any other expenditures pursuant to a real property investment, Sneddon seemed to conclude that *all* property owners in the city recover on their investment because of "guaranteed profitability."

33.    Santamaria also relied on anecdotes and speculation to respond to historical data presented by SBRPA and its members before casting a vote in favor of the Ordinances. Speaking to the room, she said "I truly don't buy the allegations that if we provide some breathing room to tenants [that] all of the sudden landlords won't be repairing units, *because you weren't doing it already*."[23] She discounted the concerns of hundreds of rental property owners who showed up to comment on the Ordinances in an arbitrary manner. "Just put things in perspective. We're talking about, you know, the allegations of 'I'm just going to lose my building,' right? We're talking about somebody 'losing' [demonstrating air quotes]. You're not going to 'lose' it. But losing a second, third, fifth, tenth home."[24]

34.    Defendant City Council cited "housing affordability" as a primary driver behind the Ordinances.  Such concern, however, was certainly pretextual. The Rent Freeze Ordinance exempts rental units that are protected under the Costa-Hawkins Act of 1995, including rental units that obtained a Certificate of Occupancy after February 1, 1995. In other words, the Rent Freeze Ordinance only applies to certain rental units 31 years or older. On information and belief, such older rental units make up most "affordable" housing units in the city of Santa Barbara. Plaintiffs are further informed and believe that such units are more likely to require repairs and maintenance and, thus, such units are the most at risk of being removed from the rental market, especially under the Rent Freeze Ordinance. On

---

[22] *Dec. 16th Meeting*, at 6:07:15.

[23] City of Santa Barbara – City TV (@Citytv18), *City Council – January 13, 2026*, YOUTUBE (Jan. 13, 2026, 6:28:16), accessible at https://www.youtube.com/watch?v=_YVSWamKzIw [hereinafter *Jan. 13th Meeting*].

[24] *Jan. 13th Meeting*, at 6:30:20.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

information and belief, the result of the Ordinances with respect to the affordable housing supply is more likely to *reduce* the number of affordable rental units in the City of Santa Barbara, given this higher risk of removal. Therefore, Defendant City Council's blatant disregard to such public concerns gives rise to an inference that "housing affordability" was pretextual and that, ultimately, the adoption of the Ordinances was arbitrary, capricious, and not rationally related to the issue of housing affordability.  Purportedly discussing housing affordability, Santamaria instead referred to broader political issues that have nothing to do with local housing affordability, stating "[t]here are I.C.E. kidnappings — and I'm gonna [*sic*] say it that way — in our community. People need, now more than ever, to be able to have a stable home and have a place to keep their children safe."[25]

35.    Defendant also failed to consider the degree to which the Rent Freeze Ordinance penalizes rental property owners whose annual rent adjustments are already subject to statewide limitations. *See, e.g.*, Tenant Protection Act of 2019, Calif. Civ. Code § 1947.12(a).

36.    Defendant City Council recognized what was clear from the outset— no emergency exists that justifies or permits the enactment of a sweeping and overbroad ordinance that unduly impairs the real property rights of Plaintiffs.  Thus, the Ordinances failed to garner the five votes required to pass an "Emergency" ordinance.  The Ordinances instead were adopted by a narrow margin of 4–3. Ultimately, Harmon voted for the Ordinances because "to not [adopt them] is just simply something, not only that I could not get behind morally but also would challenge our ability to do good policymaking."[26] Sneddon did so because "[m]y heart experience told me that [rent control] works."[27]

---

[25] City of Santa Barbara – City TV (@Citytv18), *City Council – January 27, 2026*, YOUTUBE (Jan. 27, 2026), accessible at https://www.youtube.com/live/O-dtRagm8cE [hereinafter *Jan. 26th Meeting*].

[26] *Jan. 13th Meeting*, at 6:25:26

[27] *Dec. 16th Meeting*, at 6:05:12.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

37.     When the Rent Freeze Ordinance was adopted, the majority of councilmembers evinced confusion about its scope and application, giving rise to an inference that such adoption was without thorough understanding and, thus, arbitrary, capricious, and an abuse of discretion. Councilmember Rowse stated that "[w]hat we have now is a lot of fear [and] a lot of confusion."[28] Sneddon relied on double-speak to claim: "*We're not freezing rents*. This is just a very temporary moratorium on increases while we can collect and establish [more information]."[29] She also asked for clarification about which properties were exempted. Similarly, Jordan was puzzled after a question from a constituent about whether a single lot with two single-family dwellings on it was exempt or not.

### *Defendants appear to fall short of full compliance with the technical requirements of the City Charter*.

38.     Procedurally, the Ordinances were adopted "by reading of Title only." However, Defendant City Council did not fully comply with the technical requirements of City Charter section 511 at the time of introduction and adoption. Such section states that if an Ordinance is introduced or adopted after reading of the Title, it shall be read in full, unless "the further reading thereof *is waived by unanimous consent of the Council[members] present*, . . ."  On information and belief, Defendant City Council did not provide their unanimous consent to waive the further reading of either Ordinance after reading of the title. The unanimous consent of the City Council is not a mere formality, especially when voting on a substantial ordinance with widespread economic and social consequences that can only be fully assessed by a thorough and complete understanding of its mechanisms and intricacies. A true and correct copy of Section 511 of the Charter of the City of Santa Barbara is attached hereto as **Exhibit D** and is incorporated herein by

---

[28] *Jan. 27th Meeting*, at 49:40
[29] *Jan. 27th Meeting*, at 40:08; see *Moratorium*, BLACK'S LAW DICTIONARY (12TH ED. 2025) (defining "moratorium" as "the suspension of a specific activity".

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

reference.

39. On information and belief, after the Ordinances were adopted, the City Clerk did not fully comply with the technical publication requirements. Section 512 of the City Charter requires the City Clerk "to publish each ordinance at least once in the official newspaper within 15 days of adoption." On information and belief, neither Ordinance, nor their respective titles, were published in the *Santa Barbara Independent*, *Noozhawk*, *Santa Barbara News-Press*, or *Edhat*, and no alternative method of publication was voted on. A true and correct copy of Section 512 of the Charter of the City of Santa Barbara is attached hereto as **Exhibit D** and is incorporated herein by reference.

***The Rent Freeze Ordinance provides no mechanism for relief due to individual circumstances and, thus, violates the Takings Clause of the Fifth Amendment.***

40. Where a statute regulating rent increases provides "no meaningful mechanism" for a property owner to seek and obtain individualized relief from the statute's generally applicable strictures, the statute is confiscatory on its face and, thus, an unconstitutional taking. *See Richardson v. City and Cty. of Honolulu*, 802 F.Supp. 326, 334–37 (D. Haw. 1992).

41. The Rent Freeze Ordinance provides ***no mechanism*** for individual property owners to petition for, or obtain, a variance nor is there an appeals process. This means that ***all*** owners for whom the Rent Freeze Ordinance applies to are precluded from relief or rent adjustment based on economic hardship or special circumstances, regardless of their unique situation; even in an emergency.

42. Without such opportunity, Plaintiffs have no method of guaranteeing a reasonable rate of return on their investment, which is required by the United States and California Constitutions. *See* Calif. Civ. Code § 1947.15(a)(1). It is black-letter law that such a blatant omission results in a confiscatory, unconstitutional Taking.

43. While the Rent Freeze Ordinance is described as "temporary," it may be extended. However, even if it did absolutely expire at the end of 2026, on

information and belief, Plaintiffs' ability to recover an expected return on their property in future years would be impacted by state law limiting the ability to raise rents in 2026 and beyond. Moreover, "if government action would qualify as a taking when permanently continued, temporary actions of the same character may also qualify as a taking." *Ark. Game & Fish Comm'n v. U.S.*, 568 U.S. 23, 26 (2012).

### *Circumstances compel Plaintiff Teresa Patiño to raise below-market rental rates, but the Rent Freeze Ordinance precludes such remedial measures without exception, even in the circumstance of an emergency repair.*

44.     In or around September 2013, Teresa Patiño purchased a duplex at 1315 Blanchard Street, in the City of Santa Barbara ("Blanchard Property") for approximately $735,000. At the time of purchase, Ms. Patiño planned to rent each of the two, two-bedroom units as a retirement investment but did not anticipate the Blanchard Property would eventually become subject to a rent control ordinance thirteen years later. At the time of purchase, no local rent control scheme or ordinance had been discussed by the City Council nor enacted since the City of Santa Barbara became an American city in 1850. The Blanchard Property is currently subject to the Rent Freeze Ordinance, is not exempt, and Ms. Patiño is precluded by the Rent Freeze Ordinance from raising rents on the property.

45.     Ms. Patiño currently rents each unit to two separate groups of tenants. On information and belief, Ms. Patiño charges at least one of the two groups, a family, below-market rent. However, such below-market rates are unsustainable in light of existing financial obligations, required capital improvements and repairs, and constantly changing economic conditions. For example, Ms. Patiño must make monthly mortgage and interest payments that, considering rising insurance premiums, property taxes, and general inflation, are increasingly hard to afford from the low rate of return she currently receives on the Blanchard Property.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

Moreover, the Blanchard Property was built in or around 1930 and, on information and belief, is therefore more likely to require repairs to maintain habitability because the property is more susceptible to structural degradation, mold, and other required improvements, which may compound over time. Ms. Patiño is required by law to make such repairs, but she may not be able to afford to make such repairs under the existing rent structure that is frozen based on the Rent Freeze Ordinance.

46.     In 2025, the gross rental income received from the Blanchard Property was approximately $80,000. However, debt obligations and operating expenses on the property totaled approximately $71,000. This resulted in a minuscule profit to Ms. Patiño of approximately $8,900, a mere 1.2% annual return on investment. Such a small return on investment is unsustainable — and unreasonable — under existing circumstances. From 2024 to 2025, Ms. Patiño's insurance premiums rose 32%; and property tax rates increased by approximately 2%. Ms. Patiño also forecasts further increases and substantial maintenance and repair costs in 2026. These factors compel Ms. Patiño to raise her generous, below-market rental rates on the Blanchard Property to fulfill an expectation of at least a 6% return on investment in 2026. But under the Rent Freeze Ordinance, Ms. Patiño is precluded from doing so. On information and belief, the Blanchard Property has decreased in value since the Rent Freeze Ordinance was adopted.

47.     Ms. Patiño is precluded from petitioning for an economic hardship variance or filing an appeal under the Rent Freeze Ordinance. This means that she cannot request permission from Defendant City of SB to raise the rents on the Blanchard Property in accordance with California law or in the event of an emergency repair. Under present circumstances, she is *required* to raise rents on the Blanchard Property to maintain a safe and habitable premises for her tenants, and to ensure a reasonable rate of return on her retirement investment.

///

///

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

***Plaintiff JKRK, L.P. pauses significant repair projects to ameliorate the detrimental impact of the Rent Freeze Ordinance, yet an economic hardship variance is still required to ensure a reasonable rate of return in 2026.***

48.    In or around July 2002, Plaintiff JKRK acquired 123 East Micheltorena Street, which is in the City of Santa Barbara ("Micheltorena Property"). The Micheltorena Property includes 16 units, including eight one-bedroom apartments and eight two-bedroom apartments. At the time of acquisition, JKRK did not anticipate a rent control ordinance in the City of Santa Barbara, including the Rent Freeze Ordinance, would prohibit raising rents during its ownership of the Micheltorena Property. Nevertheless, the Micheltorena Property is not exempt from the Ordinance, thus, JKRK is precluded from raising rents on the Micheltorena Property, despite historical practice of annually raising rents by a modest amount to offset increasing operating expenditures.

49.    The Micheltorena Property was built in 1955, and on information and belief, is therefore more likely to require constant maintenance, repairs, and improvements because many structural materials and components are increasingly susceptible to erosion and degradation over time. Without anticipating the Rent Freeze Ordinance in late–2025 or early–2026, JKRK planned significant repairs and improvements on the Micheltorena Property for the 2026 Calendar Year. JKRK also planned to raise rents within legal limits during 2026, including prior to filing this Complaint, to offset such expenditures. However, the projects — some of which are partially complete — are currently on hold because the Rent Freeze Ordinance precludes such offset.

50.    For example, in March of 2026, JKRK installed new windows in the majority of units, which cost more than $76,000. But the remainder of the window-replacement project is currently paused because of an inability to ameliorate an additional expense of approximately $65,000 by a slight increase in rental rates.

18

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

Similarly, at least seven units need new balconies to comply with State law and insurance requirements, and to ensure safety of the premises. Several balconies have already been replaced at a cost of approximately $30,000 each. However, the balcony-repair project is also paused because of the ordinance's restriction on raising rents, which prevents JKRK from offsetting such expense. Last, JKRK planned to replace the aging roof covering the property. Such replacement is estimated at approximately $125,000 to $135,000. With the other paused projects, JKRK is hesitant to move forward with the roof replacement because of an inability to offset such expenses because of the ordinance.

51.     The Rent Freeze Ordinance increases the degree that the cumulative cost of such repairs, in combination with other required expenditures, outweighs the expected gross rental income in the Micheltorena Property in 2026. On information and belief, the total costs for such repairs would exceed $400,000. Ordinarily, JKRK would increase the rental rates according to State law to offset the cost of such significant expenditures and attempt to obtain a positive rate of return, ideally a rate of approximately 10%. However, without an ability to raise rents under the Rent Freeze Ordinance, completing the repairs as planned would certainly result in a net negative return on investment in 2026 in light of current rental income projections. On information and belief, the value of the JKRK investment property has decreased since the Rent Freeze Ordinance was adopted.

52.     The Rent Freeze Ordinance further prevents JKRK from ensuring a rate of return of approximately 10% because there is no pathway to petition for an economic hardship variance or filing an appeal. This means that JKRK cannot request permission from Defendant City of SB to raise the rents on the Micheltorena Property in accordance with California law to ameliorate the significant expenses planned for 2026. On information and belief, such expenses would increase in the event of discovering further problems requiring fixing, or an emergency occurs that requires further work to repair. Under circumstances of

19

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

completing all of the planned repairs JKRK would be *required* to raise rents on the Micheltorena Property to maintain a safe and habitable premises for its tenants. On information and belief, under present circumstances, JKRK is entitled to a variance to ensure a reasonable rate of return on investment.

### *The Rent Freeze Ordinance deprives senior owners of Plaintiff 3442 Richland LLC a reasonable expectation to supplement their social security income by obtaining a fair return on their investment, without recourse.*

53.     Plaintiff 3442 Richland LLC ("3442 Richland") is owned by two senior citizens of Santa Barbara, who invested in 3442 Richland Drive ("Richland Property") to provide rental housing and supplement their retirement income. The Richland Property includes seven apartment rental units. Without rental income, the owners, who are in their seventies, would be solely reliant on social security benefits. On information and belief, the owners also rely on such income to assist with paying the high price of medical bills to the extent that such costs are not covered through their insurance plans.

54.     On information and belief, the Richland Property was built in 1965 and purchased by 3442 Richland in 2005 for $1,550,000. At the time of purchase, 3442 Richland did not anticipate a rent control ordinance, such as the Rent Freeze Ordinance, would prevent otherwise lawful rental rate increases in 2026. However, the Rent Freeze Ordinance applies, and the Richland Property is not exempt from the ordinance, so 3442 Richland is precluded from raising rents on the property in 2026.

55.     The Richland Property is more than fifty years old. On information and belief, the property's structural materials are more susceptible to degradation with time, and therefore, the property is more likely to require an emergency repair stemming from an aging component than a newer property. 3442 Richland is also informed and believes that the Richland Property is also more likely to require

costly routine maintenance and repairs to comply with laws and insurance requirements, and to maintain safe and habitable premises for the tenants, than a newer property. For example, 3442 Richland planned to conduct several repairs and improvements to the Richland Property in 2026, such as installing new windows, painting the exterior of the building, and installing a new roof. However, on information and belief, the costs of such repairs would exceed $93,000. 3442 Richland is further informed and believes that the cumulative expenses of such repairs, coupled with general inflation, rising insurance premiums, property taxes, utilities fees, and other routine expenditures, would result in a net negative income from the Richland Property in 2026. On information and belief, 3442 Richland plans to pause the commencement of such repairs while the Rent Freeze Ordinance is effective because of an inability to offset such expenditures with slight rental-rate increases.

56. 3442 Richland planned to raise rents for several units in 2026, including prior to the filing of this Complaint, to obtain an expected return on the property, but it is precluded from doing so under the Rent Freeze Ordinance. On information and belief, whether or not 3442 Richland commences repairs on the property, under the Rent Freeze Ordinance, it is deprived an opportunity to recover an expected return of approximately 7.5–9%, based on a 5% basic return plus estimated C.P.I.[30] Moreover, 3442 Richland cannot obtain a hardship variance to ameliorate the costs of its expenditures, or in the event of a sudden event requiring an emergency repair, an emergency variance, because the Rent Freeze Ordinance does not provide a procedure to apply for a variance or an appeal. 3442 Richland also cannot petition for a variance to guarantee a reasonable rate of return under the ordinance. If such pathway was available, 3442 Richland would apply for a

---

[30] Organisation for Economic Co-operation and Development (commonly referenced "OECD") recently predicted that inflation for "G20" countries, including the United States, will reach 4% in 2026. *See* OECD, TESTING RESILIENCE: OECD ECONOMIC OUTLOOK, INTERIM REPORT 5 (March 2026) (delineating inflation projections).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

variance.

57.     On information and belief, the substantial negative financial impact of the Rent Freeze Ordinance on the Richland Property will compound over time and diminish the value of the property. 3442 Richland is further informed and believes that the value of the Richland Property decreased since the Rent Freeze Ordinance was introduced.

***Plaintiff 1501 SB, LLC's Cap Rate for 2026 is substantially lower than expected under the Rent Freeze Ordinance, but an opportunity to counterbalance such effect without neglecting the property is a fool's errand under the Rent Freeze Ordinance.***

58.     Plaintiff 1501 SB, LLC ("1501 SB") purchased an eight-unit apartment building in 2019 for approximately $4,100,000. The property is located in the City of Santa Barbara and is subject to the Rent Freeze Ordinance, is not exempt, and thus, 1501 SB is precluded from raising rents while the ordinance is in effect, against its will. On information and belief, 1501 SB typically raises rents on an annual basis in an amount less than the maximum allowable under California's Tenant Protection Act, which allows an increase of 5% plus C.P.I. to obtain a reasonable rate of return on the property. A reasonable rate of return is important because 1501 SB also remains vigilant about anticipated structural repairs, maintenance, and improvements, and prioritizes high-quality materials and aesthetics that contribute to Santa Barbara's historic Spanish-style architecture and its architectural reputation. 1501 SB typically accounts for modest rent increases in its annual budget to offset such predetermined repairs and improvements. But under the Rent Freeze Ordinance, 1501 SB is poised to make a negative income without an avenue for remediation, and on information and belief, the value of the property has decreased.

59.     In 2026, 1501 SB projects an operating deficit of approximately

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

$100,000 due to repairs, maintenance, improvements, and an inability to recuperate the expenses because of an inability to raise rent – its sole method of income related to the property. Some of the budgeted-for repairs are not necessarily required by law, but others are currently, or will be in the near future. For example, California Senate Bill 721 ("SB 721"), enacted in 2024–25, requires recurring safety inspections of "exterior elevated elements," including balconies, decks, and/or stairways in certain multi-unit apartment buildings, including in 1501 SB's property. Due to the novelty of such law, and a policy of strict compliance, 1501 SB conducted its initial inspection by 2025, and budgeted $175,000–$250,000 in expenditure for preventive improvements for 2026. However, such cost is volatile, and could increase depending on several factors not discoverable until repairs have begun.

60.     1501 SB takes a "preventive" approach to property maintenance by making repairs and improvements before minor or catastrophic accidents occur, such as a leaky ceiling or balcony collapse, would happen. But the Rent Freeze Ordinance threatens such practice by holding 1501 SB's ability to ensure a reasonable rate of return "hostage" throughout 2026, and perhaps beyond, especially without a pathway for remediation and in the event of a structural emergency.

61.     The property owned by 1501 SB was built in 1961. On information and belief, such property is more vulnerable to costly repairs because of decaying components when compared with newer buildings. Going on six years of ownership, 1501 SB experienced substantial, unexpected repairs costs due to the aging nature of the property and its components. Seventy-five percent of the units experienced plumbing emergencies because of eroding cast-iron pipes that, on information and belief, had not been upgraded or replaced since the building was constructed 65 years ago.

62.     Some unexpected repairs at the property have also arisen out of routine

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

or abnormal tenant conduct. In another instance, a tenant flooded a second-floor apartment, causing substantial destruction of the apartment, and the ceiling, walls of the unit underneath. In addition to removing and replacing the water-damaged components, 1501 SB also bore the cost of relocating the tenant of the first-floor apartment for several weeks in one of Santa Barbara's hotels while repairs were made. In 2023–24, a unexpected gas leak and failing water heater required immediate replacement of the water heater systems and gas line infrastructure, which exceeded $100,000 in total costs. Before the Rent Freeze Ordinance, 1501 SB planned to offset some of the costs of these expenditures with a rent increase in 2026, including before filing this Complaint, but is now precluded from doing so.

63.    In 2025, Nationwide, 1501 SB's state-accredited insurer, left California and unexpectedly dropped coverage. Such event required 1501 SB to conduct an extensive search in a short window of time to obtain new insurance coverage. 1501 SB secured a non-accredited insurer, whose deductible is $20,000 more than the previous insurer. The property remains insured, however, on information and belief, insurance policy coverage prices are increasing, and the number of state-accredited insurers has decreased since 1501 SB took ownership in 2019. If such trends continue in 2026, and a catastrophic event occurs with or without coverage, the costs required to fix the resulting damage could cause a financial setback that would further require an increase in rents to offset. In such event, 1501 SB would typically apply for relief from the Rent Freeze Ordinance, but as written, the ordinance does not include such option. Under current circumstances, without such unexpected expense, 1501 SB remains on track to recover nothing on their investment for 2026, in part, because the Rent Freeze Ordinance prevents it from raising its rent without an opportunity for recourse.

64.    In 2024 and 2025, the Cap Rate for the property was 3.8% and 4.9%, respectively. In 2026, 1501 SB expected such rate to decrease slightly due to higher expenses but still expected a rate higher than what is obtainable under the Rent

Freeze Ordinance. Unless 1501 SB abandons its policy of strictly complying with state laws and insurance requirements, or its ideology of maintaining a high-quality property, foregoing its planned projects, there is no method under the ordinance to reduce the burden of the Rent Freeze Ordinance. And abandoning projects could expose 1501 SB to future liability, further diminishing their expected return, and increasing safety risk to the tenants.

### *The Just Cause Eviction Amendments are preempted by the Ellis Act.*

65.     The Ellis Act generally prohibits a public entity from enacting an ordinance which compels a residential real property owner to offer or continue to offer accommodation in the property for rent. *See* Gov't Code § 7060 *et seq.* The Just Cause Eviction Amendments are in direct conflict with the Ellis Act because the amendments prevent Plaintiffs from removing less than all rental units in a particular rental property from the rental market. In effect, a rental property owner who wants to remove one or more rental units from the rental market, if the number of rental units they want to remove is less than the total number of rental units on the property, is restricted from doing so. This means that a rental property owner is faced with a Hobson's Choice to remove all rental units on the "property" from the market, or none of them, a stricter regime than prescribed by the Ellis Act, which only requires removal from the rental market of all "accommodations", defined as the residential units in a detached physical structure.  (Gov't Code § 7060(b)(1); see also Gov't Code § 7060.7(d)(1).  On information and belief, the result of maintaining a rental unit that an owner would have removed but for the Just Cause Eviction Amendments compels an owner to offer or continue to offer such property for rent. Such compulsion is in direct conflict with the Ellis Act's prohibition on ordinances which have such effect. The Just Cause Eviction Amendments are, therefore, preempted by the Ellis Act and are unenforceable.

66.     The second Just Cause Eviction Amendment prohibits a converted

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

rental unit from reentering the rental market for a period of *five years*. Such Amendment conflicts with the Ellis Act, and punishes rental property owners who want to remove less than all properties from the rental market, or even those who wish to remove all rental units for a period of less than five years. It functions as a deterrent to removing any number of rental units from the market, for any period of time, regardless of the owner's intentions for doing so. On information and belief, this effectively prevents an owner from removing their rental units and, thus, compels them to offer or continue to offer accommodation in the property for rent. Such restriction is in conflict with the Ellis Act and is, therefore, preempted. *See S.F. Apt. Assoc. v. City and Cty. of S.F.*, 207 Cal.Rptr.3d 684, 693 (2016).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (Facial Violation of Takings Clause of the Fifth and Fourteenth Amendments—

### 42 U.S.C. § 1983)

67.    All Plaintiffs reallege and incorporate herein by reference each and every allegation as though fully incorporated herein.

68.    Adopting a temporary rent control ordinance without a mechanism from relief based on individualized circumstances, including emergencies or economic hardship, cannot guarantee a reasonable rate of return on rental property owners' investments. By doing so in the Rent Freeze Ordinance, Defendants violated the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation. *See Ark. Game & Fish Comm'n v. U.S.*, 568 U.S. 23, 26 (2012) ("[I]f government action would qualify as a taking when permanently continued, temporary actions of the same character may also qualify as a taking.").

69.    An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs seek a declaration of

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

rights. *See* 28 U.S.C. § 2201. Plaintiffs further seek injunctive relief enjoining Defendant City of SB from enforcing its unlawful ordinance.

## SECOND CAUSE OF ACTION

### (As-Applied Violation of Takings Clause of the Fifth and Fourteenth Amendments—

### 42 U.S.C. § 1983)

70. Property-owner Plaintiffs reallege and incorporate herein by reference each and every allegation as though fully incorporated herein.

71. The character of the Rent Freeze Ordinance is substantially motivated by private interests.

72. The Rent Freeze Ordinance decreases the value of each property-owner Plaintiffs' investments.

73. The Rent Freeze Ordinance deprives property-owner Plaintiffs an opportunity to obtain a reasonably expectable rate of return on their investment property while the ordinance remains effective.

74. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs seek a declaration of rights. *See* 28 U.S.C. § 2201. Plaintiffs further seek injunctive relief enjoining Defendant City of SB from enforcing its unlawful ordinance, and just compensation.

## THIRD CAUSE OF ACTION

### (Violation of Due Process Clause of Fifth and Fourteenth Amendments

### 42 U.S.C. § 1983)

75. Plaintiffs reallege and incorporate herein by reference each and every allegation as though fully incorporated herein.

76. The deprivation of Plaintiffs' vested property and liberty rights, to set rents that provide a reasonable rate of return on their property, without notice or an opportunity to be heard, violates its rights to due process under the Fifth and

Fourteenth Amendments of the U.S. Constitution.

77.    Defendants' adoption of the Rent Freeze Ordinance violates Plaintiffs' procedural due process rights insofar as such fails to provide any meaningful process for Plaintiffs to seek redress for the deprivation of their constitutional rights.

78.    The Rent Freeze Ordinance does not rationally relate to the Ordinance's purported purpose, is discriminatory, arbitrary and capricious, and unfair.

79.    An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs seek a declaration of rights. *See* 28 U.S.C. § 2201.  Plaintiffs further seek injunctive relief enjoining Defendant City of SB from enforcing its unlawful ordinance.

## FOURTH CAUSE OF ACTION

### (Violation of Equal Protection Clause of Fourteenth Amendment
### 42 U.S.C. § 1983)

80.    Plaintiffs reallege and incorporate herein by reference each and every allegation as though fully incorporated herein.

81.    Defendants' adoption of the Rent Freeze Ordinance violates the Equal Protection Clause of the Fourteenth Amendment by arbitrarily and unconstitutionally discriminating between a group of individuals (property owners) and another group of individuals (property lessors) without a rational basis.

82.    An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs seek a declaration of rights. *See* 28 U.S.C. § 2201.  Plaintiffs further seek injunctive relief enjoining Defendant City of SB from enforcing its unlawful ordinance.

///

///

///

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

**FIFTH CAUSE OF ACTION**

**(Declaratory Relief based on State Preemption—28 U.S.C. § 2201)**

83. Plaintiffs reallege and incorporate herein by reference each and every allegation as though fully incorporated herein.

84. The Ellis Act prohibits a municipal ordinance from compelling a rental property owner to offer or continue to offer accommodation for rent.

85. The Just Cause Eviction Amendments effectively compel rental property owners to offer or continue to offer accommodation of their rental units for rent in contradiction to the Ellis Act.

86. Plaintiffs are entitled to a declaration of its rights and legal obligations under California law with respect to the Just Cause Eviction Amendments.

87. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs seek a declaration of rights. *See* 28 U.S.C. § 2201. Plaintiffs further seek injunctive relief enjoining Defendant City of Santa Barbara from enforcing its unlawful ordinance.

**SIXTH CAUSE OF ACTION**

**(Writ of Mandate—Calif. Code Civ. Proc. § 1085)**

88. Petitioner SBRPA realleges and incorporates herein by reference each and every allegation as though fully incorporated herein.

89. California Code of Civil Procedure section 1085 authorizes Petitioner SBRPA to seek a Writ of Mandate to void the Rent Freeze Ordinance and to enjoin its enforcement based on prejudicial abuse of discretion or error of law.

90. In introducing and adopting the Rent Freeze Ordinance, Respondent City Council failed to fully comply with the technical requirements of the City Charter.

91. Respondent City of SB failed to fully comply with the technical requirements for publicizing the enacted Ordinance.

92. The Senior Assistant to the City Administrator exceeded her authority

29

by informally introducing a temporary rent control ordinance during a legislative session, which led to the introduction and adoption of the Rent Freeze Ordinance.

93. City Council's adoption of the Rent Freeze Ordinance was reckless, unfair, irrational, arbitrary and capricious, entirely without credible evidentiary support, and unrelated to the Ordinance's purported purpose.

94. Respondent City Council disregarded and ignored several credible studies that would have weighed against adopting the Rent Freeze Ordinance because such would have adversely affected their political interests in reelection.

95. Petitioner has a beneficial interest in immediately voiding the Rent Freeze Ordinance and enjoining its enforcement to prevent further violation of its Constitutional rights, as alleged above.

96. Petitioner does not have a plain, speedy, or adequate remedy in the ordinary course of law, therefore, writ relief is necessary to compel Respondents to correct their actions, which are unlawful, and enjoin Respondent City of SB from enforcing its unlawful ordinance.

97. Issuing a Writ of Mandate would serve the public interest, thus, Petitioner is entitled to its attorneys' fees under Calif. Civ. Code § 1021.5.

98. Petitioner is also entitled to its attorneys' fees under Gov't Code § 800(a) because adoption of the Rent Freeze Ordinance was arbitrary and capricious, lacking any reasonable basis, and illegal.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek judgment and request relief against Defendants as follows:

99. A preliminary injunction enjoining enforcement of Rent Freeze Ordinance and Just Cause Eviction Amendments, and any similar rent control ordinance, whether temporary or permanent.

100. A declaratory judgment that the Rent Freeze Ordinance constitutes an unconstitutional taking under the United States Constitution and violates Plaintiff's

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE

right to due process of law.

101. A declaratory judgment that the Just Cause Eviction Amendments are preempted under California law by the Ellis Act.

102. A declaratory judgment that Rent Freeze Ordinance and Just Cause Eviction Amendments are null and void and, thus, unenforceable.

103. Attorneys' fees and costs under 42 U.S.C. § 1988; Calif. Civ. Code § 1021.5; Gov't Code § 800(a).

WHEREFORE, Petitioner seeks:

104. A writ of mandate striking down the Rent Freeze Ordinance as null and void for the reasons set forth above and/or ordering Respondents City of SB and City Council to rescind the Rent Freeze Ordinance.

105. For such further relief as the Court may deem just and proper, including just compensation based on unconstitutional taking for each individual plaintiff in an amount to be determined at trial.

Dated: April 3, 2026

Respectfully submitted,

CAPPELLO & NOËL LLP

By: _/s/ A. Barry Cappello_

A. Barry Cappello (CSB No. 037835)
G. Michael Brelje (CSB No. 269476)
Richard Lloyd (CSB No. 332101)
David Edholm (CSB No. 362232)
CAPPELLO & NOËL LLP
831 State Street
Santa Barbara, CA 93101-3227
Telephone:  (805) 564-2444
Facsimile:   (805) 965-5950

*Attorneys for Petitioner/Plaintiffs*

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; VERIFIED PETITION FOR WRIT OF MANDATE